August D. Liebe and Genevieve Liebe v. Commissioner.
Liebe v. Commissioner
Docket No. 4140-63.
United States Tax Court
T.C. Memo 1965-320; 1965 Tax Ct. Memo LEXIS 8; 24 T.C.M. (CCH) 1781; T.C.M. (RIA) 65320; December 15, 1965
Eugene Bernstein, 77 W. Washington St., Chicago, Ill., for the petitioners. Kenneth B. Samuels, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1953 and 1954 in the amounts of $33,767.50 and $15,020.38, respectively. The sole issue for decision is whether amounts paid by petitioners to Anthony J. Accardo are deductible as business expenses *9 in each of the years here in issue. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Chicago, Illinois, filed joint Federal income tax returns for each of the calendar years 1953 and 1954 with the district director of internal revenue at Chicago, Illinois. August D. Liebe (hereinafter referred to as petitioner) during the years 1953 and 1954 was engaged in gambling operations. Petitioner had been engaged in the gambling business or operation all his adult life. During the years 1944 through 1947, petitioner in partnership with two other persons named John Kelly and Leo Weiss operated a gambling establishment known as the Vernon Country Club. This operation was located in Deerfield, Illinois, a suburb of Chicago and offered a number of gambling games including roulette, blackjack and "check dice." The "check dice" game was played with chips purchased in the establishment and bets in this game were limited to no more than $100. The Vernon County Club did not operate a "money dice" game during the years 1944 through 1947. The Vernon County Club did not operate after September 7, 1947 and during most *10 of the balance of the year 1947 through the year 1952 petitioner was employed in a gambling establishment operated by an individual named Johnny Drew. In early April 1953 petitioner decided to open his own gambling establishment and on April 6, 1953, opened this establishment offering roulette, blackjack and two dice games along with slot machines and a poker game. The two dice games were "check dice" with a bet limit of $100 and a "money dice" game which differed from "check dice" in that cash and not chips were used and the bet limit was higher. At the beginning of the operation the bet limit on petitioner's "money dice" game was $300. While petitioner had been engaged as a partner in the Vernon County Club during 1944 through 1947 each of the partners had received as his distributive share of the partnership net income approximately $40,000 a year for 1944, 1945, and 1946, and a proportionately less amount in 1947 because the business did not operate during the full year 1947. Petitioner's two partners in the Vernon Country Club had a more limited knowledge of gambling than petitioner had and did not participate in the operations to the same extent as petitioner. They would *11 be around when the business was operating and assist in the operations to some extent. During 1945, 1946, and 1947 an individual named Rocco Fischetti (hereinafter referred to as Fischetti) was employed by the Vernon Country Club as a "floorman" or overseer. Fischetti put no money at risk in the Vernon Country Club but his duties as a floorman or overseer included supervising the gambling operation, particularly the dice games and roulette wheel. For the year 1946 Fischetti's compensation, including straight salary and bonuses, totaled $31.200 and for the period January through August 1947 Fischetti was paid $16,880 by the Vernon County Club. Fischetti had been employed by the Vernon Country Club because he previously had worked in gambling houses and knew the operations of gambling houses and knew many players. Shortly after petitioner commenced operating his own gambling establishment on April 6, 1953 he employed Fischetti at a daily salary of $40 plus a $10,000 annual bonus. Petitioner's payments to Fischetti in 1953 aggregated $18,400. Both petitioner and Fischetti were familiar with the operations of gambling establishments and had a wide acquaintance with players who participated *12 in gambling activities. At the time petitioner opened his gambling establishment on April 6, 1953 he placed approximately $17,000 in cash at the disposal of the business consisting of $15,000 he put on the tables with which to operate and approximately $2,000 which he carried in cash on his person in case it were needed in the business. In addition petitioner had other investments and funds which he did not put into his gambling operation. During April 1953 petitioner's gambling establishment had a minimum of $1 and a maximum of $100 in the check dice game and a minimum of $5 and a maximum of $300 on the money dice game. The odds in both the money dice and check dice games favored the house by approximately 1.4 to 1 on socalled "do" bets and by approximately 1.42 to 1 on "don't" bets. "Do" bets were bets that the player would make his points and "don't" bets were bets that the player would not make his points. Prior to employing Fischetti in April 1953, petitioner had approached Fischetti with respect to "putting up" some money with him and becoming a partner in the gambling operation. Fischetti refused the offer but did agree to become an employee. Petitioner had approached Fischetti *13 about becoming a partner because players who had come into his establishment with whom he had become acquainted while working with Johnny Drew had questioned why the limit on the "money dice" game was $300 instead of $500. Petitioner believed he needed available additional money or cash for the house in order to raise the limit on the "money dice" game to $500. Because of the risk of losing the entire bankroll of the gambling operation in a "raid" by Governmental authorities, petitioner was unwilling to risk putting the amount which he had in other investments into the gambling operation. For this reason he approached Fischetti about putting money in the business. Petitioner believed the profits from the gambling operation would increase because of the 5 percent commission charged on the "short end" of the bet in the money game, because a higher limit would attract "bookmakers" who would take side bets which in turn would attract big bettors to petitioner's business and because the higher limit would appeal to gamblers who would not be interested at the lower limit. When Fischetti declined to put money into petitioner's operations he suggested to petitioner that a man by the name of *14 Joe Baders might be interested in "putting up" money for the operation and made an appointment for petitioner to talk to this person. The person whom Fischetti referred to as Joe Baders was in fact Anthony J. Accardo (hereinafter referred to as Accardo). Petitioner met with Accardo during the last week in April 1953 and Accardo agreed to put up $15,000 for petitioner's operations. At that time Accardo was operating a gambling establishment in Calumet City known as the Owl Club which had a "check dice" but not a "money dice" game. Petitioner offered Accardo a partnership in his gambling operation in return for Accardo's putting up $15,000 or adding $15,000 to the "bankroll." Accardo refused the offer suggesting in lieu thereof that he bring players who were "high rollers" to petitioner's establishment and "help out" petitioner with half of any moneys he might need in case he had a "bad run of luck," and that he be paid by petitioner $250 a day on days when the "money game" was open. Petitioner and Accardo made an oral agreement in accordance with Accardo's suggestion. Sometime in May 1953 the "money game" was raised to a $500 limit. Accardo came to petitioner's gambling establishment *15 on an average of two or three times a week bringing with him players who generally played the "money game." Accardo, in addition, sent over from the Owl Club which did not operate a "money game," players to play the "money game." The players brought or sent over by Accardo were generally persons whom petitioner had not met before. No one was admitted to petitioner's place of business without being identified so when players were sent over they would be asked for a password before they were admitted. Accardo himself never participated in any of the games when he was at petitioner's establishment. He gave assistance to petitioner in the handling of undesirables and assisted in collections of I.O.U.'s which petitioner took on occasions. From January 1 through February 28, 1954 Fischetti's daily salary remained at $40 and for the period March 1, 1954 through May 22, 1954 Fischetti's daily salary was $60. Fischetti's total salary from petitioner during the period January 1 through May 22, 1954, aggregated $5,740. During the years 1953 and 1954 friends of Fischetti often visited petitioner's gambling establishment. In 1953 petitioner paid Accardo $49,000 and in 1954 petitioner paid Accardo *16 $30,750. Prior to and during the trial of this case at Chicago, Illinois, Accardo resided in River Forest, Illinois, a suburb of Chicago. For the years 1953 and 1954 petitioner received net profits from his gambling establishment, after deduction of the amount paid to Accardo, as well as salaries and other expenses the deductions of which are not contested by respondent, in the amounts of $45,236.52 and $20,431.56, respectively. In April 1953 petitioner's gambling establishment was open only 21 days. For the months of May through October 1953 the establishment was open every day and during the remaining months of operation, petitioner's business was open as follows: 1953
November
25 days
December
28 days
1954
January
every day
February
every day
March
26 days
April
every day
May
24 days
June
4 days
For each of the months of April 1953 through June 1954, petitioner realized gross profits (representing the excess of "Ins" over "Outs") from the operation of his "check dice," "money dice," wheels, blackjack, and from slots, poker and cigarette service as follows: 1953
April
$ 9,203.00
May
24,906.00
June
26,619.53
July
27,599.00
August
25,747.24
September
27,186.20
October
27,577.70
November
22,092.61
December
22,279.00
1954
January
$26,408.63
February
22,773.61
March
21,325.60
April
23,268.15
May
20,041.65
June
2,375.59
*17 On no day during the period April 6, 1953 through June 12, 1954 did petitioner suffer a loss from his "money dice" game in excess of $2,422 which was the loss from the operation of that game on March 6, 1954. Similarly, petitioner's greatest daily loss from the operation of his "check dice" game was $1,235 on July 31, 1953. The greatest daily loss from the combined operation of the "check dice" and "money dice" games occurred on September 14, 1953 and was $2,103. On each night that petitioner's gambling establishment was open there was on an average of approximately 50 to 75 players present. On some evenings if the weather were bad or the snow heavy there might be substantially less than 50 persons visiting petitioner's establishment and on some nights there might be as many as 100 to 150 people visiting petitioner's establishment during the night. The following schedule shows the monthly "In" and "Out" take from the "money dice" game for the month indicated: 1953
Ins
Outs
April
$ 8,106.00
$ 3,444.00
May
21,471.00
5,214.00
June
16,033.00
5,381.00
July
17,125.00
3,967.00
August
16,301.00
5,757.00
September
15,676.00
6,484.00
October
19,037.00
6,697.00
November
12,394.00
2,688.00
December
15,937.00
5,440.00
$142,080.00
$45,072.00
1954
January
$ 18,391.00
$ 5,861.00
February
13,267.00
4,571.00
March
12,143.00
4,287.00
April
15,676.00
5,065.00
May
9,990.00
3,338.00
June
553.00
330.00
$ 70,020.00
$23,452.00
*18 During the period April 6, 1953, through December 31, 1953, approximately 30 individuals other than Fischetti were employed by petitioner and received payments from petitioner aggregating $81,785 and during the period January 1, 1954, through May 22, 1954, approximately 30 individuals other than Fischetti were employed by petitioner and paid amounts aggregating $41,345. Respondent in his notice of deficiency issued on June 26, 1963, petitioner having signed numerous extensions of the statute of limitations on assessment and collection prior to the date of the issuance of the notice, disallowed $49,000 of the deductions claimed by petitioner as salary and wages for the year 1953 and $30,750 of the amounts so claimed on petitioner's income tax return for 1954. The only explanation given in the deficiency notice for the disallowance of the deductions was that the amounts had not been shown to constitute "allowable deductions" under section 23(a) of the Internal Revenue Code of 1939 and section 162 of the Internal Revenue Code of 1954. In the agent's report dated June 17, 1963, a copy of which was furnished to petitioner, the reason for the disallowances was *19 explained as follows: 1953
Salaries
$49,000.00
The above amount was paid to Anthony J. Accardo at the rate of $1500.00 per week. It is disallowed as not being ordinary and necessary. It is not clear what services, if any, were performed. Sec. 162(a)(1) - 1954 I.R.C.
* * *
1954
Salaries
$30,750.00
Above amount paid to Anthony J. Accardo is disallowed as being not ordinary and necessary. It is not clear what, if any, services were performed. Sec. 162(a)(1) - 1954 I.R.C.
Opinion The agent's report which formed the basis of the notice of deficiency in the instant case as well as the payroll records kept by petitioner which are stipulated into the record of this case show that the amounts disallowed were actually paid by petitioner to Accardo. Respondent does not question that in fact these payments were made by petitioner but takes the position that Accardo rendered no services to petitioner for the payments. Respondent's argument is based primarily on cases involving excessive salaries where a part of the amount paid to an individual has been disallowed. The record is unequivocally clear that Accardo did render some services *20 to petitioner. He "put up" $15,000 in cash to be used in the bankroll and agreed to "help out" in a run of bad luck to the extent of half the losses. The record reasonably may be interpreted that the amount "put up" by Accardo was not to be returned to him in case it was lost either by a run of bad luck at the gambling tables or by being a part of the confiscated bankroll in case the operation was closed by governmental authorities. When the gambling establishment closed, apparently without confiscation or loss of the bankroll, the $15,000 was returned to Accardo by petitioner but this does not show it to be a loan to petitioner in any true sense of the word. Whether petitioner's judgment was correct or not it was petitioner's belief that he could not operate the "money dice" game at a $500 limit without the extra bankroll. The record is unequivocal, and much of the testimony by subpenaed disinterested witnesses shows, that Accardo brought in a number of "high rollers" to play at petitioner's establishment. Although these players sometimes played other games, they primarily played the "money dice" game. The facts show that a high percentage of the total gross profits of petitioner's *21 operation came from the "money dice" game after the limit on that game was increased to $500. Although the specific time that the increase in the bet limit was made is not unequivocally clear in the record, a fair inference from the record is that an increase in the bet limit did occur shortly after petitioner's agreement with Accardo which would place the time in May of 1953. After that time the gross profits from the "money dice" game increased. The record also shows some other assistance in the business by Accardo, including advice on "undersirables," collection of I.O.U.s, bringing players to the place of business, and sending players from the Owl Club. Petitioner's business was not open to the general public but depended for its customers on persons known to the management or made known to the management. No person was admitted without being identified. Therefore, obtaining players was an important part of making a success of the business. Considering the record as a whole, we conclude that some amount of compensation is properly deductible for the services rendered to petitioner by Accardo. As stated by the Supreme Court in Commissioner v. Sullivan, 356 U.S. 27 (1958) *22 where a gambling enterprise is recognized as a business for Federal tax purposes the policy "that allows as a deduction the tax paid to conduct the business seems sufficiently hospitable to allow the normal deductions of the rent and wages necessary to operate it." The record shows that in petitioner's judgment he needed someone to assist him by putting up money in the gambling operation and when Fischetti was unwilling to do so he made an arrangement with Accardo pursuant to an appointment made by Fischetti. The arrangement was a business arrangement even though because of the nature of the business being conducted Accardo may have been in a position to drive a hard bargain. Such a fact would not tend to show that the amount was excessive for the type of business operation involved. While the amount paid Accardo was high, it is not grossly out of line with the amounts paid Fischetti by the Vernon Country Club in earlier years. Fischetti had no investment in the Vernon Club but was apparently present every night and not merely 2 or 3 nights a week. Where, as here, the evidence shows services rendered under an agreement made as a business arrangement between unrelated parties we consider *23 it sufficient to discharge petitioner's initial burden of proof. The record is not completely clear as to whether petitioner had met Accardo before the latter part of April 1953 but does show that he made the arrangements to have a business conference with him through Fischetti, an indication that he was certainly not well acquainted with Accardo. Respondent in the instant case produced no evidence but relies solely on the presumptive correctness of his determination and petitioner's failure to call Accardo as a witness. It is our view that the testimony of petitioner, corroborated in many respects by the testimony of the five disinterested witnesses each of whom testified with regard to services rendered by Accardo, is sufficient to overcome the presumptive correctness of respondent's determination. If respondent believed that Accardo's testimony would be contrary to any of the evidence produced by petitioner, he could have called Accardo as his witness. The risk involved in a business such as petitioner's is shown by many of the facts in the record to be associated with high profits by the participants. In petitioner's testimony it was made clear that those who participated *24 in his business as did Accardo not only with money but by coming to the establishment and bringing players took chances other than mere money risks and it was the anticipation of high profits in many instances that made them willing to take the chances. Respondent neither at the trial nor on brief suggests any reason for petitioner's payments to Accardo other than as compensation except a vague hint that the $250 weekly payments might have been a repayment of the $15,000 "put up" by Accardo as a "loan" to petitioner. The evidence as a whole supports petitioner's position that the $15,000 was not a loan but money put at risk in the business. Under all the facts here present we consider that petitioner has sustained his burden of proof. The record contains nothing to suggest an amount other than that petitioner actually paid Accardo as reasonable compensation for Accardo's services. This is not a question of a partial disallowance of excessive salary. The agent's report that formed the basis of the deficiency notice shows that the total amount paid Accardo was disallowed and at the trial respondent's counsel stated this to be the fact. The record shows that Accardo was taking as *25 much risk as each of the three partners who had operated the Vernon Country Club had taken and that Accardo rendered some of the same services to petitioner's business that each of the partners had rendered to the business of the Vernon Country Club partnership. Accardo's compensation was fixed but in fact amounted to about the amount that each partner of the Vernon Country Club received as his yearly portion of the distributive net income of the partnership. This is some indication that in the type of business here involved the payments to Accardo were not excessive. While Accardo did not take a chance of less income as did a partner, neither did he have the same opportunity for a higher income. The evidence is not of the strongest nature. However, the difficulty of obtaining testimony from individuals who must admit to their participation in a gambling operation in order to testify cannot be completely overlooked in evaluating the evidence offered. We consider that the evidence offered is sufficient to overcome the presumption of correctness of respondent's determination and, though weak, is adequate to cause a preponderance of the evidence to support petitioner's position. The only *26 evidence in the record favors petitioner and respondent not only offered no rebuttal evidence but does not question the credibility of the testimony of any witness except petitioner or suggest any reason why petitioner would make the payments he made to Accardo if such payments were not for services rendered. Decision will be entered for petitioner.